Filed 12/29/15  P. v. Quinones CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIETTA QUINONES,<br><br>    Defendant and Appellant. | 2d Crim. No. B256714<br>(Super. Ct. No. 2011037742)<br>(Ventura County) |

Julietta Quinones appeals from the judgment entered after a jury convicted her of six counts of grand theft (counts 1-6, Pen. Code, § 487, subd. (a));[1] one count of theft from an elder with respect to property exceeding a value of $950 (count 7, § 368, subd. (d)(1)); one count of filing a false state income tax return (count 8, Rev. & Tax. Code, § 19705, subd. (a)(1)); and two counts of failure to file a state income tax return (counts 9-10, *Id*., § 19706).  As to the theft convictions, the jury found true an "aggravated white collar crime enhancement" that appellant had taken more than $200,000 within the meaning of section 186.11, subdivision (a).  Appellant was sentenced to prison for eight years, eight months.

---

[1] All statutory references are to the Penal code unless otherwise stated.

1

Appellant contends that her statements to district attorney investigators should have been excluded because they failed to give required *Miranda* warnings.[2] In addition, she contends that the evidence is insufficient to support her conviction of theft from an elder, that she can lawfully be convicted on only one count of grand theft, and that the evidence is insufficient to support her tax convictions.

We conclude that the evidence is insufficient to support her conviction of theft from an elder. We also conclude that appellant can lawfully be convicted on only one count of grand theft for thefts committed pursuant to a single scheme that we refer to as the "blank-check" scheme. We reverse the convictions on counts 2, 4, 6, and 7 and remand the matter for resentencing. In all other respects, we affirm.

*Facts*: *Theft Charges*

Jane Donohoo was born in 1942. She owned half of JAL Properties, LLC, which held title to numerous residential rental properties. Her children owned the other half. Donohoo ran the company without any input from her children. She had to make mortgage payments on all of the properties. The properties' monthly gross rental income was between $14,000 and $16,000.

In 2008 Donohoo had difficulty making the mortgage payments. Appellant told Donohoo that she worked in real estate and would "take care of [her] financial problems." At appellant's direction, from February 2009 through September 2011 Donohoo regularly gave appellant signed blank checks. The checking account was in the name of JAL Properties, LLC. Appellant said that she would fill out the checks and use them to make the mortgage payments. Whenever appellant asked for a check, Donohoo "would tear out a check [from her checkbook], sign it and give it to [appellant] with a blank payee line."

On two occasions appellant said that her son, Elisio Mendez, had loaned money to Donohoo to help make the mortgage payments. On each occasion, appellant

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

wrote a check to Mendez in the amount of the loan. One check was for $7,000 and the other was for $3,000. Mendez testified that he had never loaned money to Donohoo.

On another occasion Donohoo wrote a check for $8,000 payable to appellant. Appellant told Donohoo that this check was in payment of a loan that she had made to Donohoo to help make the mortgage payments.

In December 2009 Donohoo went to New Mexico for two months. When Donohoo returned, appellant said that she had changed the address to which mail concerning the mortgages was sent. The mail used to be sent to Donohoo's home. With the change of address, it was sent to appellant's home.

Donohoo did not contact the mortgage lenders that were supposed to be receiving the payments. She believed everything that appellant told her. Appellant said that "she had some friends in the bank that would do her favors."

One day Donohoo received a telephone call from the bank where her JAL account was located. The bank said that she was the victim of fraud. Donohoo went to the bank and discovered that the blank checks she had given to appellant had not been made payable to the mortgage lenders. Instead, they had been made payable to various persons in various amounts. When she learned of the fraud, Donohoo "wanted to die."

*Information: Theft Counts*

Count 1 was based on checks totaling $20,606 payable to Mark Kasley, appellant's landlord. Count 2 was based on checks totaling $26,809 payable to Juventino Abrajan, appellant's husband. Count 3 was based on checks totaling $128,824 payable to appellant. Count 4 was based on checks totaling $31,227 payable to appellant. Count 5 was based on checks totaling $10,000 payable to Eliseo Mendez, appellant's' son. Count 6 was based on checks totaling $4,650 payable to cash. Count 7, the only theft count charged as theft from an elder, was based on one check for $5,592 (check number 2615) payable to Timothy Hall. Donohoo testified that she did not know anyone named Timothy Hall.

3

*Facts: Tax Charges*

In July 2010 appellant and her husband filed a joint California income tax return for 2009. Appellant reported adjusted gross income of $192,032, including gambling winnings of $174,197. But 1099-G forms from casinos showed that her gambling winnings were $204,318. Appellant did not report $71,820 that she had stolen from appellant in 2009. The total unreported income was $101,959.

Appellant did not file a California income tax return for 2010 or 2011. Her income for 2010 was $195,682, including gambling winnings of $81,656 and theft proceeds of $114,026. Her income for 2011 was $188,971, including gambling winnings of $115,511 and theft proceeds of $73,460.

*Alleged Miranda Violation*

Without giving *Miranda* warnings, two district attorney investigators interviewed appellant inside her home. They confronted her with incriminating evidence and asked for an explanation. Appellant contends that her statements should have been excluded because *Miranda* warnings were required.

"It is settled that *Miranda* advisements are required only when a person is subjected to 'custodial interrogation.' [Citations.]" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970.) "On appeal, we defer to the trial court's factual findings supported by substantial evidence and independently determine from the factual findings whether appellant was in custody for *Miranda* purposes. [Citation.]" (*Ibid*.)

"Whether a person is in custody is an objective test: the pertinent inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [Citation.] The totality of the circumstances is considered and includes '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's

4

freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect. [Citation.]" (*People v. Davidson*, *supra*, 221 Cal.App.4th at p. 970.)

The trial court considered each of the five *Davidson* factors and concluded that appellant was not in custody. The court noted that she had not been formally arrested, that the interrogation had lasted for more than one hour, and that it had taken place inside her home, "the most favorable of all locations . . . in the sense favorable to the nonoperation of the *Miranda* rule." The court further noted that the interrogation had occurred "during normal business hours" and that the ratio of investigators to the suspect had been two to one.

As to the investigators' demeanor, the court observed that, before the interrogation began, one of them had stated that they had received "a real estate fraud complaint" and wanted "to get both sides . . . before [they] decide[d] what to do with the case." This statement was important because it showed "that they are out on a prefiling investigation and that their intention is not to take [appellant] into custody. . . . [W]hatever information they get from her is going to be filtered into a filing decision which may or may not result subsequently in her arrest." Near the end of the interrogation, an investigator had emphasized: "[W]e're not going to take you to jail right now. . . . [W]e're going to walk out of here." The court continued: "And then finally and of significance . . . is the fact that, as they part, [appellant] actually thanks the agents."

We agree with the trial court that appellant was not subjected to custodial interrogation. She was not in custody merely because parts of the interrogation were accusatory. In *People v. Moore* (2011) 51 Cal.4th 386, the defendant was interrogated for one hour and 45 minutes after he had agreed to go to the sheriff's station and give a statement. Some of the questions were accusatory. But the detectives "expressly told defendant he was not under arrest and was free to leave. . . . Defendant was not handcuffed or otherwise restrained, and there was no

5

evidence the interview room door was locked against his leaving." (***Id***., at p. 402.)  In concluding that the defendant was not in custody for *Miranda* purposes, our Supreme Court reasoned: "While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody.  (See [*Oregon v. Mathiason* (1977) 429 U.S. 492,] 493-495 [97 S.Ct. 711, 50 L.Ed.2d 714] [no custody where defendant agreed to interview at police station, was told in interview that the police suspected him of a burglary and told (falsely) his fingerprints had been found at the scene, but was allowed to leave at conclusion of interview].)" (***Id***., at pp. 402-403, last brackets in original, other brackets added.)

Similar reasoning applies here.  Like the defendants in *Moore* and *Oregon v. Mathiason*, appellant agreed to be interviewed by the investigators.  They telephoned her in advance, and she said that she was at home.  When the investigators arrived, she said it was "okay" to "sit down at [a] table" and talk.  During the interrogation, there was no restraint on appellant's freedom of movement.  At any time she could have walked away or told the investigators to leave.  From the beginning, the investigators made clear that they were not going to arrest her.  When the interrogation ended, they said that they would write a report and submit it to a prosecutor, who would "review everything" and "decide what [he] want[s] to do with it."  "It is clear from these facts that [appellant] was not in custody 'or otherwise deprived of [her] freedom of action in any significant way.' " (*Oregon v. Mathiason*, *supra*, 429 U.S. at p. 495.)  "[A] reasonable person in appellant's circumstances would have believed . . . that [s]he was not under arrest and was free to terminate the interview . . . if [s]he chose to do so." (*People v. Moore*, *supra*, 51 Cal.4th at p. 403.)

6

*The Evidence is Insufficient to Support the*

*Conviction of Theft from an Elder*

Appellant argues that the evidence is insufficient to support her conviction of theft from an elder because the property taken belonged not to Donohoo but to a limited liability company. The crime of theft from an elder is committed by "[a]ny person who is not a caretaker who violates any provision of law proscribing theft . . . *with respect to the property . . . of an elder* . . . , and who knows or reasonably should know that the victim is an elder." (§ 368, subd. (d), italics added.) The jury was instructed that the People must prove that "[t]he property taken was owned by an elder."

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

Only one count - count 7 - charged appellant with theft from an elder. During closing argument, the prosecutor told the jury that this count was based on check 2615: "The defendant used Ms. Donohoo's check 2615 to pay Timothy Hall. The property taken was owned by an elder. . . . Check 2615 was for $5,592." Check 2615 was drawn on the account of "JAL Properties, LLC" (JAL), a limited liability company (LLC). Donohoo testified that JAL owned the properties. She owned half of JAL and her children owned the other half.

Thus, the $5,592 taken from JAL's account was not the property of an elder. It was the property of an LLC, " 'a hybrid business entity formed under the Corporations Code and consisting of at least two "members" [citation] who own membership interests [citation]. The company has a legal existence separate from its members.' " (*PacLink Communications International, Inc. v. Superior Court* (2001)

7

90 Cal.App.4th 958, 963 (*PacLink*).) As a member of the LLC, Donohoo "never held an ownership interest in the property to which the LLC held title." (*Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562, 1570; see also *PacLink*, *supra*, 90 Cal.App.4th at p. 964 [members of LLC not directly injured by LLC's loss of assets because they hold no direct ownership interest in the assets].)

  *People v. Eastburn* (2010) 189 Cal.App.4th 1501, is distinguishable. There, the defendant was convicted of forgery from an elder in violation of section 368, subdivision (d). The defendant forged checks drawn on an elder's bank account held in the name of his "dba," Sutherland & Associates. (*Id*., at p. 1503.) "The designation 'dba' or 'doing business as' simply indicates that [the owner] operates his sole proprietorship under a fictitious business name. [Citation.]" (*Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1200.) The defendant contended that "the evidence effectively compelled the jury to find that the actual victim of his crime 'was a business entity, and not an elder adult.' " (*Id*., at p. 1503.) This court rejected the contention because "[t]here is no legal distinction between an individual and the fictitious names under which he or she does business." (*Id*., at pp. 1505-1506.) On the other hand, there is a clear legal distinction between an LLC and its members. (Corp. Code, § 17701.04 ["A limited liability company is an entity distinct from its members"].)

  Thus, the evidence is insufficient to support appellant's conviction on count 7 of theft from an elder. But the evidence would be sufficient to support a conviction of the lesser included offense of grand theft. However, as we shall explain, the conviction on count 7 must be reversed. (See *infra,* pp. 9-12.)

*Multiple Grand Theft Convictions*

  Appellant argues that, because all of her thefts were committed against a single victim pursuant to "the same plan to steal Donahoo's money through unauthorized checks ostensibly written to cover monthly mortgage payments," she may be convicted of only one count of grand theft. Appellant relies on *People v.*

8

*Bailey* (1961) 55 Cal.2d 514.  There, our Supreme court concluded, "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan.  [Citation.]"  (*Id*., at p. 519.)

In *People v. Whitmer* (2014) 59 Cal.4th 733, 735, the Supreme Court interpreted *Bailey* as meaning "that a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme."  The court reasoned, "[A] serial thief should not receive a 'felony discount' if the thefts are separate and distinct even if they are similar."  (*Id*., at pp. 740-741.)

The Supreme Court decided not to retroactively apply its interpretation of *Bailey* because a "long, uninterrupted series of Court of Appeal cases . . . have consistently held that multiple acts of grand theft *pursuant to a single scheme* cannot support more than one count of grand theft."  (*People v. Whitmer*, *supra*, 59 Cal.4th at p. 742, italics added.)  The Supreme Court reasoned, " 'Courts violate constitutional due process guarantees [citations] when they impose unexpected criminal penalties by construing existing laws in a manner that the accused could not have foreseen at the time of the alleged criminal conduct.' [Citations.]"  (*Ibid*.)  "[G]iven the numerous, and uncontradicted, Court of Appeal decisions over a long period of time that reached a conclusion contrary to ours, we believe today's holding is also an unforeseeable judicial enlargement of criminal liability for multiple grand thefts.  Accordingly, that holding may not be applied to defendant."  (*Ibid*.)

The defendant in *Whitmer* was the manager of a motorcycle dealership. He was charged with the fraudulent sale of 20 motorcycles to fictitious buyers, resulting in losses to the dealership.  The crimes were committed on 13 different dates. "[A] jury convicted [him] of 20 counts of grand theft, one count for each of the

9

vehicles fraudulently sold." (*People v. Whitmer*, *supra*, 59 Cal.4th at p. 735.) The jury found true an enhancement allegation that, pursuant to "a common scheme or plan," the defendant had taken property valued at more than $200,000. (§ 12022.6, subd. (b).)[3] In view of this true finding, the Supreme Court held that the defendant could be convicted of only one count of grand theft. "The law as it had existed for decades before defendant committed his crimes permitted conviction of only one count of grand theft under those circumstances." (*People v. Whitmer*, *supra*, 59 Cal.4th. at p. 742.)

Whitmer was decided after the commission of appellant's thefts in 2009-2011. We therefore apply the law as it existed prior to *Whitmer.* We review the record to determine whether substantial evidence supports a finding that appellant committed the thefts pursuant to multiple schemes rather than "pursuant to a single scheme." (*People v. Whitmer*, *supra*, 59 Cal.4th at p. 742; *People v. Jaska* (2011) 194 Cal.App.4th 971, 983-984.)

As to the thefts based on the blank checks (counts 1, 2, 4, 6, 7) that Donohoo gave appellant, there is no substantial evidence that these thefts were committed pursuant to multiple schemes rather than a single scheme. Donohoo relied on appellant's misrepresentation that she would fill in the blanks and use the checks to make mortgage payments on Donohoo's properties. Instead, appellant made the checks payable to persons other than the mortgage lenders. Thus, appellant can be convicted on only one count of grand theft for the thefts committed pursuant to the "blank-check" scheme. As the prosecutor stated during closing argument, these thefts "were all committed the same way by virtue of her unlawfully converting the checks

---

[3] Section 12022.6, subdivision (b) provides in pertinent part: "In any accusatory pleading involving multiple charges of taking, damage, or destruction, the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and *arise from a common scheme or plan*." (Italics added.)

that were intended to pay the mortgages to her personal use, either for herself, for her family members or to pay her debts."

Our decision is supported by *People v. Packard* (1982) 131 Cal.App.3d 622. There, the defendant fraudulently billed a studio for the reproduction of scripts. From 1976 to 1978, the studio paid the defendant more than $472,000. He was convicted on three counts of grand theft: the first for the thefts in 1976, the second for the thefts in 1977, and the third count for the thefts in 1978. The court found merit in the defendant's argument "that as a matter of law there was a single theft pursuant to one intention and general plan or scheme to steal money from [the studio]," and that there was "no reasonable basis in the record for concluding that [he] had three separate schemes, each based neatly on calendar years." (*Id*., at p. 626.) The court concluded: "In the absence of any evidence from which it could reasonably be inferred that [defendant] had three separate intents and plans, the only reasonable conclusion supported by the record is that [defendant] had a single continuing plan or scheme for stealing money from [the studio]. [Citation.] [Defendant] should have been convicted of only a single grand theft." (*Id*., at p. 627.)

On the other hand, substantial evidence supports a finding that the grand theft alleged in count 5 was not committed pursuant to the "blank-check" scheme. Count 5 did not involve a blank check. It was based on two checks totaling $10,000 that Donohoo had written and made payable to Eliseo Mendez, appellant's son. Donohoo wrote the checks pursuant to appellant's misrepresentation that they were in payment of loans that Mendez had made to Donohoo. Thus, appellant can be separately convicted of grand theft as alleged in count 5.

Likewise, appellant can be separately convicted of grand theft for the $8,000 check (check number 2640) that Donohoo made payable to appellant. Donohoo relied on appellant's misrepresentation that this check was in payment of a loan that she had made to Donohoo. Thus, the theft based on this check was also not committed pursuant to the "blank-check" scheme. In People's Exhibit 2, this check is

11

listed among the checks underlying count 3. The conviction on count 3, therefore, stands.

As to the remaining theft counts (counts 1, 2, 4, 6, and 7), only one of the convictions stands because the thefts underlying these counts were committed pursuant to the "blank-check" scheme and, therefore, "pursuant to a single scheme." (*People v. Whitmer*, *supra*, 59 Cal.4th at p. 742.) We will affirm the conviction on count 1 and reverse the convictions on counts 2, 4, 6, and 7.

*People v. Jaska* (2011) 194 Cal.App.4th 971, is distinguishable. There, the defendant was convicted on five counts of grand theft. The court upheld all of the convictions. It reasoned: "[M]ost significantly, in most of the cases in which courts have concluded that a defendant may be convicted of only a single count of grand theft, the defendants have engaged in the same conduct and in the same manner, although on multiple occasions. In this case, in contrast, Jaska employed a variety of distinct methods to steal from BTP. . . . The five counts reflect the many ways in which Jaska abused her position of trust to embezzle money from BTP." (*Id*., at p. 985.) Here, in contrast, appellant used the same method - the "blank-check" scheme - to commit the thefts charged in counts 1, 2, 4, 6, and 7.

*The Evidence is Sufficient to Support the Tax Convictions*

In count 8 appellant was convicted of filing a false state income tax return for the year 2009. She underreported her gambling winnings and did not report the money she had stolen. She contends that the evidence is insufficient to support her conviction. We disagree. It is reasonable to infer that appellant knew the money she had stolen was subject to state income tax and that she intentionally failed to report it in the 2009 return.

In counts 9 and 10, appellant was convicted of failing to file state income tax returns for the years 2010 and 2011. Appellant argues that the evidence is insufficient to support these convictions. It is reasonable to infer that appellant knew the money she had stolen in 2010 and 2011 was reportable income and that she

12

intentionally failed to file tax returns. Based on her 2009 return in which she reported gambling winnings of $174,197, appellant undoubtedly knew that her gambling winnings in 2010 and 2011 were reportable income.

*Disposition*

The theft convictions on counts 2, 4, 6, and 7 are reversed, and the matter is remanded for resentencing. Upon resentencing, the total aggregate prison term must be recomputed and may not exceed eight years eight months. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

13

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Laini Millar Melnick,under appointment by the Court of Appeal, for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie C. Brenan, Supervising Deputy Attorney General, Brendan Sullivan, Deputy Attorney General, for Plaintiff and Respondent.